

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. AP-75,213

### MOISES SANDOVAL MENDOZA, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 401-80728-04
### IN THE 401ST JUDICIAL DISTRICT COURT
### COLLIN COUNTY

KELLER, P.J., delivered the opinion of the Court in which MEYERS, WOMACK, KEASLER, HERVEY, HOLCOMB, and COCHRAN, JJ., joined. PRICE and JOHNSON, JJ., concurred.

In June 2005, appellant was convicted of capital murder and sentenced to death.[1] Direct appeal to this Court is automatic.[2] Appellant raises eighty-one points of error. Finding no reversible error, we affirm the conviction and sentence.

---

[1] TEX. PENAL CODE §19.03(a); TEX. CODE CRIM. PROC. art. 37.071. Unless otherwise indicated, all references to articles refer to the Code of Criminal Procedure.

[2] Art. 37.071, §2(h).

## I. BACKGROUND

Sometime after 9:00 p.m. on Wednesday, March 17, 2004, Rachelle Tolleson and her mother Pam O'Neil went to the store to purchase formula and diapers for Tolleson's five-month-old daughter, Avery. Tolleson and Avery visited at the O'Neil home for a short time after returning from the store, but Tolleson did not feel well, had taken medication for a sinus headache, and wanted to be in her own home. Around 10:00 p.m., Tolleson phoned the O'Neils to let them know that she and Avery had arrived home.

Around the same time that evening, Efren Gamez, appellant, and several friends were having a party. Gamez, appellant, and two young women had purchased two thirty-packs of beer and two forty-ounce cans of beer earlier in the evening. At some point, the women left the party and later called to let Gamez and appellant know that they were not returning. Appellant became angry, and as he drank more beer, he became more belligerent. Eventually, appellant said something to two other girls at the party that scared them. Appellant told Gamez that he spoke to the girls in that manner "because he could." Appellant left the party and returned several times, finally leaving for the last time between midnight and 1:00 a.m.

The following morning, O'Neil went to Tolleson's home as she often did. Although her car was parked in the driveway, Tolleson was not there. A note from the landlord was taped to the screen door, but the wooden back door stood wide open. O'Neil entered the house and noticed that a pillow had been left on the floor between the kitchen and the bedroom. The bedroom was a mess. Papers were strewn across the floor, the night stand was pulled away from the wall, the mattress and box spring were askew, and the headboard was broken and lying against the bed. Avery was on the bed, cold, wet, and alone in the house.

Alarmed, O'Neil collected Avery and called her husband, who contacted the police. Officer Scott Collins of the Farmersville Police Department responded. Collins confirmed O'Neil's description of the bedroom – things were thrown everywhere and furniture was out of place. To Collins, it looked as though there had been a fight, or a tornado, in the bedroom. The rest of the house was orderly, and there were no signs of a forced entry.

Farmersville police began interviewing potential witnesses that day. They learned that, on the Friday before her disappearance, Tolleson hosted a party for about fifteen people, including appellant. During the party, Tolleson spoke with appellant a few times but told her best friend Megan Kennedy that she wasn't interested in appellant in "that way."

Police also learned that, on the Saturday before Tolleson's disappearance, Kennedy's boyfriend Tim Holland returned to Tolleson's home with appellant and Cody Wiltbanks to retrieve his musical instruments, but Tolleson wasn't home, and the doors were locked. While Holland and Wiltbanks went around the house looking for a way in, appellant managed to open the locked back door. After learning this, Collins interviewed appellant, who told Collins that he had last seen Tolleson at the party. Collins noted that appellant could not sit still and seemed very nervous.

Search parties were organized to look for Tolleson but were unsuccessful. Six days after Tolleson disappeared, James Powell was hunting for arrowheads near Brushy Creek, east of Farmersville. Walking along the creek, he came across a body that had been burned and was lying face down. Through the use of dental records, the body was eventually identified as Tolleson's.

Jerry Farmer, an FBI evidence technician who was one of the first on the scene, noted that tall vegetation had been piled on top of Tolleson's body in an attempt to cover it. Her body was badly burned and had begun to decompose. Fly eggs and maggot activity around her head and neck

indicated that she had been there for at least two days. Her skin was charred black in places and seared yellow in others where her flesh had split apart. Most of her hair had been burned away. Scraps of burned clothing clung to her upper torso, but no clothing was found below her waist.

An orange rope was tied around Tolleson's right ankle, and two grommets from a tarp were lying on the back of her left leg and head. Burnt pieces of tarp and skin were found on a path leading to Tolleson's body, indicating that she had been dragged or carried to that spot. A short distance from where the body was discovered, steps led to a dugout under a tall tree where investigators found evidence that something had been burned. Evidence technicians found ashes, firewood, a clump of hair, pieces of tarp and skin, and orange rope like that found tied around Tolleson's ankle.

Dr. William Rohr, the medical examiner, testified that Tolleson had sustained a five-inch diameter bruise on her left knee, a smaller bruise on the front of her left thigh, bruises on either side of her tongue, a large amount of hemorrhage deep in her left shoulder, and several bruises on her scalp ranging in diameter from three quarters of an inch to three inches. A deep wound, consistent with injury from a knife, penetrated her neck all the way to her spinal column, and her body had been burned post-mortem. Rohr determined that Tolleson's death was consistent with strangulation or another form of asphyxiation.

After further interviews with potential witnesses, police obtained an arrest warrant for appellant. Once in custody, appellant told police that, late Wednesday evening, he had driven by Tolleson's house and had seen a light on. He backed his truck into the driveway and let himself into the house through the back door without knocking. According to appellant, Tolleson left with him to get a pack of cigarettes. Appellant drove "for a little" and then "for no reason" started to choke Tolleson. Tolleson passed out, and appellant drove to a field behind his home, where he had sexual

intercourse with Tolleson and "choked her again." Appellant then dragged Tolleson out of the truck and into the field, where he choked her until he thought she was dead. To "make sure," he "poked her throat" with a knife. Appellant left Tolleson's body in the field until Monday, after he was first interviewed by police. Scared that Tolleson's body would be found and tied to him, appellant moved the body to a remote area and burned it, ultimately dragging it to where it was found.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Guilt - Underlying Offenses

In points of error twenty-three and twenty-four, appellant challenges the legal and factual sufficiency of the evidence supporting his conviction for capital murder. Appellant specifically alleges that the State did not present evidence sufficient to prove the underlying offenses of kidnapping and aggravated sexual assault. He argues that "[t]hat there is no conclusive evidence that Ms. Tolleson was abducted rather than having left her home on her own volition" and that "[t]here was no conclusive evidence that the sex between [appellant] and Ms. Tolleson was not consensual."

### 1. *Burglary – No Attack on Sufficiency*

Appellant was indicted for causing the death of Rachelle O'Neil Tolleson by strangling her with his hands and stabbing her with a knife while in the course of committing or attempting to commit the offenses of burglary and kidnapping and aggravated sexual assault. The three underlying offenses were submitted disjunctively in the jury charge so that appellant was charged with alternate methods of committing the crime of capital murder,[3] and the jury delivered a general verdict that encompassed all three theories. A verdict of guilt will be upheld if the evidence is sufficient on any

---

[3] *See Kitchens v. State*, 823 S.W.2d 256, 257 (Tex. Crim. App. 1991).

one of the theories submitted.[4]  To obtain relief on sufficiency of the evidence grounds, then, a defendant must challenge all alternate theories submitted to the factfinder.  Appellant does not explicitly challenge the sufficiency of the evidence to establish the underlying offense of burglary. However, assuming *arguendo* that appellant's consent argument with respect to the kidnapping constitutes an implied challenge with respect to the burglary, we will proceed to address his contentions.

## 2. *Legal Principles*

When deciding whether evidence is legally sufficient to support a conviction, we assess all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.[5]  Evidence is factually insufficient when, although legally sufficient, the evidence supporting the verdict is "so weak" that the verdict "seems clearly wrong or manifestly unjust" or the evidence supporting the verdict is "against the great weight and preponderance of the evidence."[6]  A factual sufficiency review is "barely distinguishable" from a legal sufficiency review.[7]  The difference between the two standards is that the legal sufficiency standard requires the reviewing court to defer to the jury's credibility and

---

[4] *Sorto v. State*, 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

[5] *Jackson v. Virginia*, 443 U.S. 307 (1979).

[6] *Watson v. State*, 204 S.W.3d 404, 414-15 & 417 (Tex. Crim. App. 2006).

[7] *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006), *cert. denied*, 128 S.Ct. 87 (2007).

weight determinations while the factual sufficiency standard permits the reviewing court to substitute its judgment for the jury's on these questions, "albeit to a very limited degree."[8]

Kidnapping is the intentional or knowing abduction of another person.[9] A person abducts another when he restrains a person with the intent to substantially interfere with her liberty by secreting or holding her in a place where she is not likely to be found or by using or threatening to use deadly force.[10] That restraint is without consent if it is accomplished by force, intimidation, or deception.[11] A person commits burglary if he enters a habitation without the consent of the owner with the intent to commit a felony or an assault or commits or attempts to commit a felony or an assault.[12] A person commits aggravated sexual assault if he intentionally or knowingly penetrates the sexual organ of another without her consent and causes serious bodily injury or attempts to cause her death in the course of the same criminal episode or uses or exhibits a deadly weapon in the course of the same criminal episode.[13]

### 3. *Application*

Although appellant claims that all of his conduct with Tolleson was consensual until he inexplicably decided to murder her in his car, the evidence at trial paints a different picture. In his statement to Ranger Davidson, appellant claimed that Tolleson left her home with him voluntarily

---

[8] *Id.*

[9] T EX. PENAL CODE §20.03.

[10] *Id.*, §20.01(2).

[11] *Id.*, §20.01(1)(A).

[12] *Id.*, §30.02(a)(1), (3).

[13] *Id.*, §22.021(a)(1)(A)(i) & (2)(A)(i), (iv).

to drive to another town to purchase a pack of cigarettes. When officials searched Tolleson's home, however, they found a three-quarter-full pack of cigarettes on a desk in Tolleson's bedroom and another pack in her car. Appellant also told officials that he had never been in Tolleson's bedroom. But his boot print was identified on paperwork that Tolleson had obtained from her uncle the day of her disappearance and that was found lying on the bedroom floor.

When O'Neil discovered Tolleson missing, it appeared that a struggle had taken place in the master bedroom. The mattress and box spring in Tolleson's bedroom were disturbed as though "something had been drug to separate the two." The sheets and comforter were in disarray at the foot of the bed, and the headboard was broken and lying at an angle against and almost on top of the bed. The night stand was turned away from the wall, and the television in the bedroom was on. Appellant argues that the bedroom was in disarray because Tolleson was in the process of packing to move. The nursery and remainder of the house, however, were in order. Also, both Tolleson's husband and mother testified that the house had not been in that condition when either had been there earlier in the day before Tolleson disappeared. It was also extremely uncharacteristic for Tolleson to be far from her five-month-old daughter, yet the child had been left alone with the outer door of the house wide open.

Appellant points out that investigators testified that there were no signs of a forced entry. However, Tim Holland testified that several days before Tolleson disappeared, he went to Tolleson's house with appellant to retrieve some musical instruments. Tolleson was not home at the time, and the doors were locked. Holland testified that the back door was "flimsy" and that appellant somehow managed to gain entry into the house through that door.

Appellant admitted to investigators that he had sexual intercourse with Tolleson, a fact that was corroborated by the presence of appellant's DNA in samples taken from Tolleson's body. While appellant claimed that the sexual intercourse was consensual, he also admitted in his statement that he choked Tolleson to unconsciousness before having intercourse with her. Appellant suggests that the choking was for the purpose of engaging in autoerotic asphyxiation. However, Tolleson had told her best friend that she was not interested in appellant in "that way" just days before her murder. Further, when Tolleson regained consciousness, appellant again choked her and then stabbed her until he believed she was dead.

While the sexual assault exam revealed no evidence of significant trauma to Tolleson's genital area, the medical examiner testified that this was not uncommon in sexual assault cases. Tolleson's body was found naked below the waist, and she had sustained bruises that the medical examiner testified were consistent with having been sexually assaulted.

Viewing the evidence in the light most favorable to the verdict, a rational trier of fact could have found appellant guilty of any of the three underlying offenses. Further, the evidence is not so weak as to make any such determinations clearly wrong and manifestly unjust, nor are any such determinations against the great weight and preponderance of the evidence. Points of error twenty-three and twenty-four are overruled.

### B. Punishment - Future Dangerousness

In point of error forty-three, appellant challenges the legal sufficiency of the evidence supporting the jury's determination regarding the future dangerousness special issue.[14] A jury may

---

[14] The special issue asks: "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, §2(b)(1).

consider a variety of factors when determining whether a defendant will pose a continuing threat to society.[15] We must view all of the evidence in the light most favorable to the jury's finding and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the future dangerousness issue was "yes."[16]

Appellant points out that no prior criminal record was introduced during punishment, that the State did not present expert testimony to rebut appellant's expert testimony, and that the State's witness testimony during the punishment phase was not corroborated. Appellant provides us with no legal authority to support the proposition that, in order to convince the jury beyond a reasonable doubt that appellant would be a continuing threat to society, the State is required to present the jury with a criminal record, expert testimony, or corroborating testimony from additional witnesses.

The jury heard the facts of the offense: appellant took Tolleson from her home, leaving behind a five-month-old baby without care or protection. Appellant choked Tolleson to unconsciousness "for no reason," sexually assaulted her, then choked her again with the intention of killing her, and finally stabbed her to make certain she was dead. Appellant left Tolleson's body in a field until he feared authorities would find it and link the murder to him. He moved the body to a desolate area and, while attempting to burn it, he chatted on his cell phone with friends.

Two of appellant's high school teachers testified that appellant had been smart, but unmanageable. Appellant was disrespectful to female teachers, lost control, and became very angry

---

[15] *See Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *see also Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).

[16] *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Crim. App. 1999).

at times. Appellant's neighbors testified that they had witnessed appellant physically attack his mother and sister. Appellant had also stolen money from his brother.

The jury also heard of appellant's often violent and callous behavior. When Robert Ramirez confronted appellant about having put a pill in a girl's drink at a party, appellant pulled a knife on Ramirez and threatened to stab him in the stomach. At another party, appellant sexually assaulted fourteen-year-old Laura Decker twice, once while a friend videotaped the encounter. Appellant later laughed as the footage of him assaulting Decker was shown at a party. When Sarah Benedict repeatedly asked appellant for a cigarette while the two sat next to each other at another party, he responded by nearly choking her to unconsciousness. He stopped only when two young men pulled him away from Sarah. The jury heard of how appellant intentionally threw a boy down onto a trampoline and "stomped" on the boy's mouth without any sign of remorse. When two young women disagreed with appellant about a camping tent, he threatened to cut their throats with a rusty saw.

The State also presented evidence from the complainants from two different aggravated robbery offenses. Melissa Chavez and Nhat Vu testified that appellant had pulled a gun on them and stolen their cars and belongings. Chavez testified that appellant attempted to force her into the trunk of the car, and Vu testified that appellant had driven away taking Vu's friend, Lian Trinh, with him. Officer Scott Kermes of the Plano Police Department testified that appellant was issued a criminal trespass warning after police responded to a disturbance call regarding threats being made and that a machete was found in appellant's vehicle. While appellant was being supervised by the Dallas County probation department and was on electronic monitoring, appellant cut the monitor from his ankle and stopped reporting to the probation officer.

Finally, the jury heard how appellant behaved while awaiting trial in the Collin County Jail. Appellant created weapons and refused to take his medication as prescribed. During his recreation time, appellant subverted the jail's security doors and attacked another prisoner.

A rational jury could determine from this evidence that, beyond a reasonable doubt, there was a probability that appellant would commit criminal acts of violence in the future so as to constitute a continuing threat to society. Point of error forty-one is overruled.

## III. GUILT PHASE ISSUES

## A. Jury Selection

### 1. *Batson*

In points of error one and two, appellant claims that the trial court erred in overruling his challenges to the State's use of peremptory strikes against venire members Scales and Anthony. Appellant argues that the State used its strikes in a racially discriminatory manner in violation of *Batson v. Kentucky*.[17] Appellant alleges that the race-neutral reasons for the strikes proffered by the State were pretext and that the only objection the State actually had to these venire members was their race.

*Batson* provides a three-step process for a trial court to use in adjudicating a claim that a peremptory challenge was based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third,

---

[17]  476 U.S. 79 (1988).

in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.[18]

A trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.[19]  Step three of the *Batson* inquiry includes an evaluation of a prosecutor's credibility.[20]  Often the best evidence of discriminatory intent is the demeanor of the prosecutor exercising the challenge.[21]  Additionally, race-neutral reasons for peremptory challenges often turn on aspects of a venire member's demeanor, such as nervousness or inattention, causing the trial court's observations to be even more important.[22]  The trial court must not only evaluate whether the prosecutor's demeanor evidences discriminatory intent, but also whether the venire member's demeanor displayed the basis for the strike.[23]

The ethnic and racial make up of the venire is not contained in the record on appeal. However, the record does show that 215 venire members were reached before the jury was filled. Of that number, the record supports that six were members of a racial minority.  Two of the six served on the jury; one was excused by agreement; one was struck for cause; and the State exercised peremptory strikes against Scales and Anthony.

*Prospective juror Scales*

---

[18]  *Miller-El v. Cockrell*, 537 U.S. 322, 328-29 (2003)(citations omitted).

[19]  *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).

[20]  *Batson*, 476 U.S. at 98, n.21.

[21]  *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008).

[22]  *Id.*

[23]  *Id.*

Immediately following Scales's individual voir dire, the prosecutor David Waddill indicated

that the State wished to challenge Scales for cause.  After conducting further voir dire, the trial court

denied the challenge for cause, and the State exercised a peremptory strike.  When defense counsel

made a *Batson* objection concerning the strike of Scales, a Hispanic juror, Waddill offered several

race-neutral reasons for the strike.  He explained:

> There are many.  First of all, my ability to communicate to the juror as to her understanding of the law was completely stymied during my entire voir dire.
>
> Towards the end, when I am talking about Special Issue 2, she began to describe to me lesser included offenses.  So my ability to explain the law to her and in my mind her ability to follow the law and understand this process, I don't have any faith whatsoever that she can do that.
>
> Number two, she has a brother who she said that she's very close to with two prior offenses where she drove him to jail to serve his time.
>
> The next one is she was raised for 20 years, the first 20 years of her life, as a Roman Catholic.  It's very well established throughout this voir dire what the position of that church, her initial church, regardless of the way she feels now, as to their position and the way she was raised as to the death penalty.
>
> I think some of her answers with regard to mitigation she still, even at the Court's last suggestion to her, does not understand the entire issue of what mitigation is or where it's going to come from.  I mean, I think the last thing she asked the Court is, is the Court going to tell us what it is.  And this is after both myself and Mr. Sanchez had spent numerous questions to her as to what the law is and what it's going to require of her as a juror.  I didn't see anything out of her as to any understanding of that basically or at all.
>
> She also describes herself as a liberal Democrat.  And that does affect my decision, completely race neutral, as to why she should not serve on this jury.
>
> The other thing I wrote on my notes to myself long ago when I first got this is she also declared bankruptcy herself, and that to me is objectionable.

Defense counsel responded that Scales understood how the Texas sentencing scheme works

after it was again explained to her by the trial court.  Counsel stated that he believed Scales had

intimated that she thought her brother's encounters with the criminal justice system had been good for him. Counsel also reminded the trial court that while Scales was raised Catholic, she had insisted that she no longer believed in Catholicism. Counsel additionally pointed out that the State had accepted Juror Number Six, who had also declared bankruptcy with her husband. After considering counsel's response, the trial court overruled the *Batson* challenge:

> The State's offered racially neutral explanations, a number of them, and based on the totality of this voir dire and her questionnaire, either one of you could have exercised a peremptory challenge for a multitude of reasons.

> As soon as you started asking your questions, Mr. Sanchez, I kind of had a suspicion it was coming up because there was no way tactically, other than the fact that she seemed to like you, that we would have spent the time we were spending other than to set up a *Batson* challenge in a case where there was no *Batson* challenge to be made.

> But that aside, there are more than sufficiently racially neutral reasons offered by [the State]. You have not in my opinion come anywhere near close to sustaining your burden that [the State] exercised this challenge in any way, manner, shape or form, partially – in any partial degree based on this individual's race.

> Your *Batson* challenge is denied and overruled.

Appellant argues to this Court that a careful review of Scales's questionnaire indicates that she would be a strong juror for the State. Appellant insists that none of the answers Scales provided on the questionnaire or to the prosecutor identify Scales as being different from jurors who were accepted by the State. Appellant further argues that while Scales initially did not understand Texas law, she did understand after it was explained to her by the trial court.

Without providing any discussion regarding other individual jurors, appellant appears to be urging this Court to engage in a comparative analysis of the jurors who were accepted by the State. The record is silent regarding the State's reasons for not accepting Scales but accepting prospective jurors who were Catholic, had filed bankruptcy, had family members with convictions, or described

themselves as liberal Democrats. Nevertheless, the record shows that while other jurors may have shared isolated characteristics with Scales, none shared a combination of characteristics such as those that caused concern for the State.

The trial court pointed out that, based on the totality of the individual voir dire and Scales's questionnaire, there were reasons for either side to strike Scales. Viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court's ruling on the peremptory strike of Scales was clearly erroneous.

*Prospective juror Anthony*

Immediately following Anthony's individual voir dire, prosecutor Greg Davis indicated that the State wished to exercise a peremptory strike. When defense counsel made a *Batson* objection concerning the strike of Anthony, a bi-racial juror, the State offered several race-neutral reasons for the strike. Davis explained:

> First of all, on her questionnaire, on Page 7, in her response to the police officers, she gave a one-word response which was profiling.

> In this case the record will reflect that the Defendant is Hispanic, is a minority. I would have great concern that her attitude towards police officers and their bias or prejudice toward minorities would influence her when hearing a police officer. And several police officers will be testifying in this case, both at the guilt/innocence and the punishment phase, Your Honor.

> Secondly, on Page 3 of her questionnaire in response to: Are you in favor of the death penalty, she stated yes. We asked: Please explain your answer. Her response was: In extreme situations the death penalty may be appropriate.

> First, the word "extreme" caused some concern to me. And as you noticed during my questioning, I asked her to please give me some understanding of what she meant by that term since it appeared to be a very hard qualifier to the death penalty.

> And despite numerous attempts to ask Ms. Anthony to qualify that answer, she was unable to do so. I still have no understanding of what she means by the term extreme.

I believe her answer was: I'm unable to answer that question. I'm unable to explain it. I can't give you a single example of what extreme means to me, either in a hypothetical sense or in a publicly-known capital murder case. And that gives me great concern about her from that standpoint.

Thirdly, on a general sense, this woman qualified essentially every answer that she gave me. Her answers were both vague – I don't believe that she was intentionally trying to evade the answers, but I think for whatever reason she was unable to give me a straight answer to probably 95 percent of my questions.

I did notice – it was my impression that her answers became much firmer and less hesitant with Mr. Sanchez. But I was greatly bothered that every question was qualified that she couldn't answer it, couldn't answer it, and on many occasions said, I can't answer that question.

And, as an example, and as a fourth point, when I asked her to tell me about her feelings about the age of 18 being the appropriate answer for death penalty eligibility in the State of Texas, and I gave her the option of rewriting that law, her answer was: I can't answer that question. I don't want to answer that question.

Fifthly, when I asked her about the issue of rehabilitation and remorse, and I gave her the example of an individual who committed an intentional murder in the course of rape, and I asked her whether that person could commit that offense and then have no remorse – and that is the State's theory in this case – she was extremely hesitant in giving me an answer to that question, took several seconds. And even then said, well, I guess it's possible, and still answered with hesitancy there. And then went on to qualify her answer there that, well, you know, that individual could have some mental problems.

That concerns me because I anticipate in this case that that will be the defense, that this individual somehow suffers from a newly-diagnosed mental illness after the commission of this offense.

Next, concerns me greatly that she has a master's in counseling, because I anticipate in this case, and I've already been given notice, that there will be psychologists and psychiatrists testifying on behalf of the Defendant. And I would not have anybody on this jury with this much experience in psychology or psychiatry regardless of their race. And that would concern me greatly because of her experience in that field that she would be essentially an expert on the jury.

On Question Number 2, when I asked about mitigation, one of the few unqualified answers that she gave me without hesitation was her answer yes, that she would keep an open mind and she would be able to consider mitigating circumstances. And I found that to be in great contrast to the remainder of her

questions. And I truly believe or fear that she'd have absolutely no problems at all considering everything as a possible mitigating circumstance in this case.

And lastly, when I asked her if she could find someone guilty of capital murder if the State proved their guilt beyond a reasonable doubt, even with that question there was hesitancy. And, in fact, she qualified that to say, well, it depends on the facts and whether he's proved guilty or not.

I found that disturbing because my hypothetical to her assumed that the person had, in fact, been found guilty, or had the evidence presented against him that would enable a juror to find him guilty beyond a reasonable doubt, and I was disturbed by that as well.

Defense counsel responded that the hesitancy cited by the State was actually "a very intelligent juror who was thoughtful before answering her questions." Defense counsel stated that, to him, it appeared that Anthony was one of the "most open-minded jurors" in the process and that "she did not want to commit to certain facts that would cause her to vote a certain way." Counsel additionally pointed out that Anthony was never asked to explain her "profiling" response to the questionnaire.

Davis further explained to the trial court that:

I did not ask any questions on [profiling] because that's a very unambiguous term to me. I clearly understand what that term means, and there is no need to further delve into that.

Profiling means – in everyday terms we hear that, and it is that individuals are singled out by police officers because of their race. That is profiling. And, in fact, I believe that's what the law that's been enacted states it to be here in Texas. So I clearly understand that term.

And I will also state for the record that no other juror who's been accepted by the State has shown even a scintilla of hesitation to the degree that this woman has.

This woman is way off the scale with regards to hesitation and evasiveness of questions. And, again, I don't claim that she intentionally evaded, but I can tell you that I could not get a straight answer out of her, and that disturbs me. And I'm not going to accept anyone who refuses to give me an answer to a question here because I'm not gonna guess on what their answers are.

The trial court found that the State offered race-neutral reasons for the strike and denied the defense's *Batson* challenge.

Appellant argues that Anthony was "clearly a qualified juror whose answers in both voir dire and on her questionnaire were no different from the non minority jurors." Appellant insists that the State's reasons for striking Anthony were pretense and the only reason she was struck is that the State "thought that as a black woman she would be more responsive to the fact that appellant was also a minority."

While a cold record cannot provide evidence of Anthony's demeanor, it does show the vagueness of Anthony's answers. During questioning by the State, Anthony repeatedly qualified her responses and could not provide examples to illustrate her answers. For example, when asked to explain in what sort of extreme situation the death penalty would be appropriate, she responded that she could not make a blanket statement. Also, when questioned about the appropriate age for the death penalty and whether everyone is capable of being rehabilitated, Anthony stated that she could not answer either question.

Viewing the evidence in the light most favorable to the trial court's ruling, we cannot conclude that the trial court's ruling on the peremptory strike of Anthony was clearly erroneous. Points of error one and two are overruled.

## 2. *Improperly Discharged Juror*

In point of error three, appellant complains that the trial court improperly discharged juror Broach as disabled. Appellant argues that Broach did not meet the definition of "disabled" and should have been required to sit on his jury.

On May 16, 2005, during her individual voir dire, Broach explained that she had been diagnosed with a "weak heart." The defense challenged Broach for cause and argued that her condition and medication would prevent her from giving the trial the proper focus "especially in a case of this importance." At that time however, there was no indication that Broach would not be able to fulfill the duties of a juror, and she was seated on the jury.

On May 26, 2005, Broach's cardiologist faxed a letter to the trial court requesting that Broach be excused from jury duty and explaining that her cardiac function had not improved and that there was a likelihood that she would soon require invasive treatments. On the morning of June 21, 2005, before the trial began but after the jury had been sworn, the trial court spoke with Broach regarding the cardiologist's fax. Broach informed the trial court that she was in the process of being scheduled for heart surgery to have a defibrillator implanted. Broach had not yet been placed on the heart transplant list. However, she admitted to the trial court that cardiac arrest was a real concern for patients with her condition. Broach stated that she had been instructed to avoid stressful situations and that she felt constantly fatigued.

The trial court asked Broach, "Is your heart condition such that it will hinder your ability to perform your duties as a juror, to sit in this courtroom, to evaluate testimony, to listen attentively, to deliberate?" Broach responded, "I believe that it will." At defense counsel's request, the trial court questioned Broach how her condition affected her daily life. Broach answered that while she continued to work at her business every day, her husband drove her and she would rest when she was tired. She continued to walk several days a week with her doctor's approval but did not work out, and she enlisted the help of others to complete household chores. The trial court found Broach disabled and discharged her from the jury over defense objection.

A trial court may discharge a juror from duty who suffers from a sufficiently serious disability.[24] A disability is generally described as some physical illness, mental condition, or emotional state that prevents a juror from performing her duties as a juror.[25] The decision to excuse a juror once the jury has been impaneled and sworn is reviewed under an abuse of discretion standard.[26]

Appellant argues that Broach did not meet the definition of "disabled" because she never affirmatively stated that her condition would keep her from being fair and impartial. Appellant also contends that Broach never stated unequivocally that the condition would hinder her ability to perform her duties as a juror but only said that she "believed" it would. Appellant takes issue with Broach's statements that she was still going to work at her business each day and argues that "[s]itting and listening to testimony is clearly less stressful than running your own business." Finally, appellant insists that Broach's fatigue could have been "easily dealt with in court."

Broach's physical activities had been curtailed such that she was no longer able to work out or complete all of her household chores herself. While she did still go to her business each day, she was driven there by her husband and often rested when she became fatigued. She was in the process of being scheduled for heart surgery and explained that there was a possibility that she would be placed on the list to receive a heart transplant. Broach had been directed by her doctor to avoid stressful situations and faced the real concern of cardiac arrest. Finally, her cardiologist contacted

---

[24] Art. 36.29; *see also Landrum v. State*, 788 S.W.2d 577, 579 (Tex. Crim. App. 1990).

[25] *Hill v. State*, 90 S.W.3d 308, 315 (Tex. Crim. App. 2002); *Carrillo v. State*, 597 S.W.2d 769, 770-71 (Tex. Crim. App. 1980).

[26] *Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003); *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999).

the trial court requesting that Broach be excused because of her deteriorating health and upcoming invasive procedures.

Given these circumstances, the trial court did not abuse its discretion in discharging Broach and replacing her with an alternate. Point of error three is overruled.

### 3. *Standefer*

In points of error four through twenty-two,[27] appellant complains that the State was permitted to pose voir dire questions that improperly committed jurors to a particular set of facts upon which they would consider probation.[28] Appellant briefs eighteen points of error complaining that the State was permitted to pose improper commitment questions. While appellant lists the names of fourteen venire members and record cites to the alleged improper questioning, in only one instance does appellant explain his complaint regarding a commitment question.

Appellant complains that prospective juror Chalifoux initially indicated that he could not consider probation in a murder case, but that after the State was allowed to pose a hypothetical involving euthanasia, Chalifoux stated that he could consider probation. The record of Chalifoux's individual voir dire, however, shows the order of events differently. The State began by explaining capital murder and the range of punishment for capital murder. The prosecutor next explained to Chalifoux the lesser-included offense of murder and gave varying examples of what could be considered murder, including the examples of a mercy killing and of someone walking out of the courthouse and shooting the first person he saw "just for fun." Defense counsel objected following

---

[27] Appellant does not individually label points of error four through twenty-two but, instead, lists the names of prospective jurors and citations to the reporter's record. If each record reference is counted as a point of error, then the points number only to twenty-one rather than twenty-two.

[28] *See Standefer v. State*, 59 S.W.3d 177 (Tex. Crim. App. 2001).

the mercy killing example referencing the defense's previous *Standefer* objections. The trial court took the objection under advisement but declined to rule until the State actually posed a question.

The prosecutor continued by discussing the wide range of punishment for murder, including probation, and explaining that punishment is dependent on the facts of the case and the background of the defendant. The prosecutor reiterated that the jury has the option of sentencing a defendant to "as little as five years probation or if they determine that he deserves 20 years, 50 years or 60 years in the pen up to life in prison, they have those options as well" for the lesser-included offense of murder. The prosecutor then asked Chalifoux: "If you were presented with a case in which you found the Defendant guilty of murder, okay, as you are here now are you open to the full range of punishment for that particular person having found him guilty of the offense of murder?" The defense objected based on *Standefer*, and the trial court overruled the objection.

Appellant argues that the euthanasia hypothetical posed to Chalifoux effectively bound him "to the idea of probation being appropriate only for those type of cases thus disingenuously planting the idea that probation in any other fact situation would be inappropriate." Appellant claims that any juror "exposed to this type of questioning [is] predisposed to impose the maximum punishment for anything that did not resemble the hypotheticals."

Commitment questions are those that commit a prospective juror to resolve, or to refrain from resolving, an issue a certain way after learning a particular fact.[29] A question may be proper if it seeks to discover a juror's views on an issue applicable to the case; however, an otherwise proper question is impermissible if it attempts to commit the juror to a particular verdict based on

---

[29] *Id*. at 179.

particular facts, unless the law requires a commitment.[30]  However, it is permissible to use fact-specific hypotheticals to explain the law, so long as the prospective juror is not asked to commit to resolve or to refrain from resolving the case a certain way based on the circumstances presented in the hypothetical.[31]

Although the prosecutor discussed a fact specific hypothetical, the hypothetical was used only to help explain the law.  The prosecutor did not seek to elicit how Chalifoux would respond to the hypothetical situation.[32]  The question the prosecutor did ask sought only to determine if Chalifoux was open to the entire range of punishment authorized by the legislature for the lesser-included offense of murder, a question that the law allows because it tests whether a prospective juror is challengeable for cause.[33]

Appellant provides no explanation or argument regarding his complaints concerning the individual voir dire of the remaining thirteen listed prospective jurors.  The points of error pertaining to those thirteen prospective jurors are inadequately briefed.[34]  In any event, even if the trial court had erred with respect to all of appellant's *Standefer* complaints, such errors would be harmless

---

[30]  *Id*. at 181.

[31]  *Atkins v. State*, 951 S.W.2d 787, 789 (Tex. Crim. App. 1997)(opinion on original submission).

[32]  *See Halprin v. State*, 170 S.W.3d 111, 119-20 (Tex. Crim. App. 2005)(euthanasia hypothetical).

[33]  *Standefer*, 59 S.W.3d at 181.

[34] T EX. R. APP. P. 38.1(h).

because appellant was found guilty of capital murder, not murder, and probation was not an option at the punishment stage of appellant's trial.[35] Points of error four through twenty-two are overruled.

## B. Evidence

### 1. *Voluntariness of Statement*

In point of error thirty-nine, appellant complains that the trial court erred in admitting his statement to the police. Appellant argues that his statement was involuntary because he believed the police wanted to speak with him regarding two extraneous aggravated robbery offenses from Dallas County. Appellant asserts that he waived his rights with regard to the Dallas County offenses only – not for the instant offense.

Appellant was arrested at his home pursuant to an arrest warrant for Tolleson's murder. He was subsequently transported to the Collin County Jail, where he was interviewed by Texas Ranger A.P. Davidson and Sergeant Mitch Selman of the Collin County Sheriff's Office. The admissibility of appellant's statement was addressed in a hearing outside the presence of the jury. Both Davidson and Selman testified that appellant was given the warnings as required by *Miranda v. Arizona*,[36] as well as the warnings required by article 38.22. Prior to initialing the warnings, appellant was told by Selman, "I want to make some closure for the family out there in Farmersville." After speaking with Davidson and Selman, appellant was again advised of his rights, and appellant again waived

---

[35] *Dowthitt v. State*, 931 S.W.2d 244, 251 (Tex. Crim. App. 1996)("Because appellant was convicted of capital murder, any erroneous or misleading hypotheticals to prospective jurors about punishment for the lesser-included offense of murder made no contribution to appellant's conviction or punishment.").

[36] 384 U.S. 436 (1966).

his rights prior to providing a written statement. During the hearing, appellant testified that he voluntarily and freely waived his rights.

The trial court is the sole and exclusive trier of fact and judge of the credibility of witnesses as well as the weight to be given their testimony in a motion to suppress.[37] The trial judge may choose to believe or disbelieve any or all of a witness's testimony.[38] This Court is not at liberty to disturb any fact finding that is supported by the record.[39] The trial court found that there was no credible evidence that appellant was threatened or coerced in any manner or that he was improperly induced into providing the statement to police. The trial court also found that appellant was properly advised orally and in writing of his rights as required by *Miranda* and article 38.22, and the trial court concluded that appellant freely and knowingly waived his rights. These findings are supported by the record.

Appellant argues that "[i]f law enforcement officers can talk to a suspect who has a lawyer on some offenses but the offense they want to talk about he has no lawyer on, because a constitutional right is fact specific, then justice requires that a suspect be Mirandized on the specific charge they wish to speak to the suspect about." We have previously addressed this argument, stating that:

> If a person has already been charged with an offense and has an attorney representing him on that charge, that attorney can tell his client not to talk to the police if questioned about anything. It is then up to the accused to decide whether or not to follow his counsel's advice. If law enforcement officers subsequently approach the suspect about another offense, whether related to the charged offense or not, and

---

[37] *Garza v. State*, 213 S.W.3d 338, 346 (Tex. Crim. App. 2007).

[38] *Id*.

[39] *Id*.

administer *Miranda* warnings, neither the federal nor the Texas constitution prevents the suspect from voluntarily waiving his privilege and speaking to officers about his other offense, even without the benefit of his counsel's assistance.[40]

The trial court did not abuse its discretion in denying appellant's motion to suppress. Point of error thirty-nine is overruled.

## 2. *Admission of Opinion Testimony*

In point of error twenty-eight, appellant argues that the trial court erred in admitting the opinion testimony of Sergeant Mitch Selman of the Collin County Sheriff's Office regarding whether the sexual activity between appellant and Tolleson was consensual. Specifically, appellant argues that the subject matter of Selman's testimony was beyond Selman's expertise and that Selman should not have been allowed to state such a prejudicial opinion without the proper qualification required of an expert witness on the issue.

Selman interviewed appellant and took appellant's written statement describing the offense. During Selman's testimony in the guilt phase, he described a diagram of appellant's house and referred to the field nearby as "where [appellant] had sexually assaulted [Tolleson] and, I guess, ultimately killed her." Defense counsel objected "to the characterization of sexually assaulted her. I don't think the testimony has been that [appellant] stated that at any time." The trial court overruled the objection. The State further questioned Selman regarding appellant's statements that the sexual activity had been consensual.

When the State asked Selman to give his opinion of whether the sexual activity had been consensual based only on what appellant had told him, the defense objected that Selman had not been qualified as an expert. The trial court sustained that objection. The State then questioned

---

[40] *Cobb v. State*, 85 S.W.3d 258, 269 (Tex. Crim. App. 2002).

Selman regarding the sequence of events as related to him by appellant. Selman testified that appellant had stated that before he had sex with Tolleson, he choked her to unconsciousness. The State then established that Selman had previous experience and training in sexual assault cases. Selman testified that he believed that he could provide an opinion as to whether or not the sexual contact between Tolleson and appellant was consensual. The defense again objected that Selman was not qualified as an expert. The State responded that it was not seeking an expert opinion. The objection was overruled.

The admissibility of evidence is within the discretion of the trial court and will not be reversed absent an abuse of discretion.[41] Although the State claimed that it was not seeking an expert opinion, it in essence did. Selman's opinion did not satisfy the requirement for lay witnesses that it be based upon a first-hand perception of the events to which the opinion relates.[42] The rule for the admission of expert testimony provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, *experience*, *training* or education, may testify thereto in the form of an opinion or otherwise."[43] We keep in mind that the inquiry into expertise is "a flexible one," and that the rule was promulgated to "relax the traditional barriers to opinion testimony."[44] A law

---

[41] *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex. Crim. App. 2002).

[42] *See id.* at 535 ("Perceptions" under the rule of evidence relating to lay witnesses "refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event (i.e., things the witness saw, heard, smelled, touched, felt, or tasted).").

[43] T EX. R. EVID. 702 (emphasis added).

[44] *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998)(quoting *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 588, 593 (1993)).

enforcement official who has no formal education on a matter can nevertheless qualify as an expert from his own experience and study.[45]  Under the facts of this case, the trial court was within its discretion to conclude Selman's testimony was admissible as expert opinion based upon his training and experience.

However, even if the trial court had erred in admitting this evidence, any such error would be harmless.  By his own admission, appellant choked his victim into unconsciousness before having sex with her, and he later killed her, moved her to a remote location, and burned her body.  These events occurred after the victim had indicated to someone that she was not interested in a sexual relationship with appellant and after the victim's bedroom had been completely wrecked.  Selman's opinion that this evidence showed that the sex was not consensual added little to what the jury had already heard.  Point of error twenty-eight is overruled.

### 3. *Admission of Photographs*

In points of error twenty-six and twenty-seven, appellant claims that the trial court erroneously admitted autopsy and crime scene photographs at the guilt stage of trial in violation of Rule 403 of the Texas Rules of Evidence.  He argues that, because the medical examiner gave detailed testimony regarding the wounds Tolleson sustained, eight autopsy photographs (State's Exhibits 63 - 70) and seven crime scene photographs (State's Exhibits 26 and 28 - 34) should have been excluded.  Appellant further complains that the photographs were almost all close-ups and that the presence of maggots and the contortion of the body make the photographs particularly gruesome.  He also complains that the photographs were displayed during trial on a ten foot by ten foot screen.  Finally, appellant complains that the photographs are cumulative of other testimony.

---

[45] *See Nenno*, 970 S.W.2d at 562.

Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."[46] A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.[47] The admissibility of photographs over an objection is within the sound discretion of the trial court.[48] Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself.[49]

State's Exhibits 26 and 28 - 34 are photographs taken at the crime scene and introduced through the testimony of evidence technician Jerry Farmer. The photographs were taken from different ranges and focus on different aspects of the crime scene, including Tolleson's body as it was initially discovered, grommets from the tarp used to move Tolleson's body, and the rope tied around Tolleson's ankle used to drag her body, as well as the evidence-collection team's attempts to remove Tolleson's body without causing further damage.

---

[46] TEX. R. EVID. 403.

[47] *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991).

[48] *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

[49] *Santellan*, 939 S.W.2d at 172.

State's Exhibits 63 - 70 are autopsy photographs of Tolleson that were introduced during the testimony of medical examiner Dr. William Rohr. State's Exhibits 63 and 64 are face up and face down photographs of Tolleson's body as it was received in the medical examiner's office. State's Exhibits 65 - 69 are autopsy photographs taken from different angles and ranges showing the wounds Tolleson sustained, how her ankle was bound, and the level of burning and decomposition of her body. State's Exhibit 70 shows the damage done to Tolleson's head from the underside of her scalp. Dr. Rohr testified that the scalp was refracted in that photograph in order to show the bruising damage that could not be seen otherwise.

The crime scene photographs, which are included in the record, are in color and are all four by six inches or smaller. The photographs reflect the fact and the manner of Tolleson's death and are no more gruesome than the offense itself. The photographs depict facts that had been testified to by witnesses at trial and which were relevant to the manner in which the offense was committed. Some of the photos were close-up and showed the details of the damage sustained by Tolleson. Appellant urges that photographs should have been excluded because they show early stages of decomposition and maggot activity which was the result of decay rather than the cause of death. The medical examiner did explain to the jury that Tolleson's body had begun to decompose and that the autopsy photographs depicted the body at the time it was received at the morgue. The autopsy photos show the condition of the body and the wounds received and, except for State's Exhibit 70, do not show any mutilation of the body. State's Exhibit 70 shows Tolleson's skull with the scalp refracted, which Dr. Rohr explained was necessary to clearly show the bruising damage to Tolleson's head. Because Dr. Rohr needed the photograph to show an injury that was otherwise not visible,

showing refraction of the scalp is not fatal to the admissibility of State's Exhibit 70.[50]  Contrary to

appellant's position, depiction of a victim's body at the precise time of death is not a prerequisite for

admissibility of photographs, nor is it fatal to admissibility when photos show decomposition and

maggot activity.[51]  Appellant has not explained why otherwise admissible photographs become more

prejudicial because of the way they were displayed at trial.

Considering all factors, we cannot conclude that the probative value of the photographs was

substantially outweighed by their prejudicial effect or the needless presentation of cumulative

evidence.  The trial court did not abuse its discretion in admitting the photographs at trial.  Points

of error twenty-six and twenty-seven are overruled.

## IV. PUNISHMENT PHASE ISSUES

### A. Evidence

### 1. *Admission of Drawing and Rap Lyrics*

In point of error twenty-five, appellant alleges that the trial court abused its discretion in

admitting at the punishment stage of trial pieces of paper containing a drawing (State's Exhibit 131)

and original rap lyrics (State's Exhibits 132 - 134).  Appellant specifically claims that the drawing

and lyrics were highly prejudicial because they "contained references to violence, mental instability,

and a reflection that whoever wrote [the contents] was tortured and angry."  Appellant also argues

---

[50]  *See Harris v. State*, 661 S.W.2d 106, 108 (Tex. Crim. App. 1983) (because refracting the skin from a victim's skull did not "obfuscate the results of the crime" but allowed the jury to see the injury, there was no error in admitting the photograph).

[51]  *See Madden v. State*, 799 S.W.2d 683, 697 (Tex. Crim. App. 1990) (photographs were admissible despite showing decomposition and change caused by submersion in water for five days); *Knoppa v. State*, 505 S.W.2d 802, 803 (Tex. Crim. App. 1974) (photographs showing the presence of decomposition and maggots on the body were admissible).

that the evidence should have been excluded because they lacked the proper "foundation" for admissibility, thus rendering them irrelevant.

State's Exhibits 131 - 134 were admitted during the testimony of Collin County Sheriff's Office Detention Officer Christy Davis. Davis testified that the exhibits had been recovered from appellant's cell at the Collin County Jail by the officer who was assigned with Davis. State's Exhibit 131 is a piece of notebook paper covered with various drawings. A flaming skull with a keyhole in the forehead occupies the center of the page. A butterfly, a flaming star, a spider web, another keyhole, and two skeleton keys surround the skull. "DEATH PENALTY" is written in the bottom left corner, and "PAYASO" is written across the top of the page. "Payaso," the Spanish word for "clown," is appellant's nickname. State's Exhibit 132 is a page of original rap lyrics or poetry signed "Moises Sandoval Mendoza 3-18-05 Payaso '05." The lyrics read:

> Don't wanna try to give you a reason for all the things that I did;
> Cause if I do I know I'll break & put a hole thru my head.
> I lay in bed toss-n-turnin fighting my conscience;
> Confident that one day I'll be forever unconscience.
> Momma never understood, but never questioned my reasons;
> Slowly breathin got me fucked up I done seen too much bleedin.
> A military minded Gangsta's the only way to survive;
> So best believe I'm still a Gangsta till the day I die.
> What should I do when times get hard if I'm condemned for my action;
> I lack the hope that things'll change cause all I see is distractions.
> So fuck 'em all I'm on my own untill I'm laid underground;
> I'm tired of pain, but fuck the change So let the Rain come down.

State's Exhibit 133 is titled "Slip Away" and reads:

> What will I be in time; I feel myself slowly goin insane
> Yeah it's about time to make an entrance, so hold up;
> I'm comin to get ya gank ya, shank ya, tie you up in back and rearrange ya
> I put my pen on paper & turn my thoughts into fire.
> I speak my mind about what I think untill the day that I die
> So let me do what I do & hold your thoughts for the toilet.
> I'm boiling and I'm bound to blow; I leave 'em gaspin for breath;

I'll chew you up and spit you out and have you askin for Death.
Whatever beef you wanna bring I'll leave you checked and dismantled.

State's Exhibit 134 is another page of lyrics that reads:

Who'd've thought a movie starts once another movie ends
Pickin friends like pickin pens; you pick 'em up and use again
Fuckin choosin is confusin so I choose not to go thru it;
Fuck 'em Screw 'em leave'm chewin on their nails while I keep on movin
See every day I make it clear that when I'm near to watch your rear;
Cause over the years I've held tears, watched my back & watched my peers
Do it now or do it never that's the sayin I live by
Don't wanna do these things that my brain tells me to do;
Don't need to live a life if I'm always alone.
I've tried my best to cry the pain out buy my brain won't let my weep out the
stress.  Would babys grow to see better days if they're taught the better ways;
My mom was there through thick & thin, but yet I still think this way.
Controll your life don't slip & fall or it'll slip & be your last.
Bone to ash & blood to dust is the way that's meant for us;
Fuck the world & Fuck the reasons time to release the inner DEMOND
Give me a screwdriver so I can dig in your temple,
Bust your face with a crow bar like I'm poppin a pimple.
Plain & simple I lose my temper its the end of your time;
I've been dreamin to be dead; cause all the pain & heavy strain fucked up my mind
Every time I take a breath it's like I'm makin a death wish
I'm having memories of nightmares; cuz there were plenty of them.

(Internal editing omitted.)  Exhibit 134 is signed "Moises Sandoval Mendoza Payaso '05."

Appellant's "foundation" claim appears to be an attack on the sufficiency of the proof of the documents' authenticity.  The authentication requirement "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."[52]  Evidence that the drawing and lyrics were found in appellant's cell is sufficient to support the inference that they were created by appellant.[53]  Additionally, because appellant did not contest the authenticity of the

---

[52] T EX. R. EVID. 901(a).

[53] *Soria v. State*, 933 S.W.2d 46, 60 (Tex. Crim. App. 1996).

signatures on the papers under oath, proof by comparison to other writing samples, such as his written statement, is also sufficient to authenticate the papers.[54] The combination of these factors supports the inference that the drawing and writings were appellant's handiwork.

With respect to the "prejudice" claim, we point out that admission or exclusion of an inmate's writings are evaluated under Rule 403 under the usual standards that confer great discretion on the trial court, and we will not find an abuse of discretion unless the trial court's determination lies outside the zone of reasonable disagreement.[55] The State introduced the papers to show appellant's continuing threat to society as indicated by his artwork and his lyrics. Under similar circumstances, we have held that the probative value of such evidence to show future dangerousness was not outweighed by the danger of unfair prejudice.[56] The trial court did not abuse its discretion in admitting this evidence. Point of error twenty-five is overruled.

## 2. *Admission of Photograph*

In point of error thirty, appellant alleges that the trial court erroneously admitted a photograph (State's Exhibit 86) at the punishment stage of trial in violation of Rule 403. He argues that Exhibit 86 was not identified by any sponsoring witness to make it relevant to any issue of punishment or

---

[54] *Druery v. State*, 225 S.W.3d 491, 502-03 (Tex. Crim. App. 2007); *see also Zimmerman v. State*, 860 S.W.2d 89, 97-98 (Tex. Crim. App. 1993), *vacated on other grounds*, 510 U.S. 938 (1993).

[55] *Green v. State*, 934 S.W.2d 92, 104 (Tex. Crim. App. 1996).

[56] *See id*. (the defendant's description of himself as "trigger happy" was indicative of future dangerousness and was not more prejudicial than probative); *see also Corwin v. State*, 870 S.W.2d 23, 35 (Tex. Crim. App. 1993) (the defendant's depiction of a large green monster holding a bloody axe and a woman's scalp had "an inferential bearing" on appellant's character for violence, which related to his future dangerousness).

applicable in any form, and he argues that the inflammatory aspects of the photograph far outweigh its probative value, if any.

State's Exhibit 86 is a photograph showing a male very closely resembling appellant from approximately the shins to the forehead reclining with the head of a female situated in his lap. "[M]e getting head" is written on the back of the photograph. Appellant objected that the State failed to present a proper predicate for the admission of State's Exhibit 86, that the photograph is irrelevant, and that its admission violates Rules 401, 402, and 403 of the Texas Rules of Evidence.[57] The trial court asked defense counsel to "tell me where you think the predicate is deficient." Counsel responded that "[w]e have no idea what this picture is about, who took the picture, when it was taken, what type of camera was used, [or] whether it fairly depicts the events that are pictured in it." The trial court viewed the photograph and then admitted it into evidence.

During the guilt phase, Sergeant Todd Rainwater testified that the photograph was found in appellant's bedroom on the evening of his arrest. State's Exhibit 76, about which Rainwater specifically testified, is a photograph taken in appellant's bedroom following his arrest and shows evidence collected from the bedroom. State's Exhibit 86 is featured prominently in that photograph. A comparison of State's Exhibits 76 and 86 supports that Exhibit 86 was found in appellant's bedroom. Further, the description written on the back of the photograph, coupled with where the photograph was found, provides evidence that the photograph is of appellant despite the lack of testimony affirmatively identifying the man in the photo as appellant.

---

[57] On appeal, appellant discusses the admission of the photograph in relation to *Erazo v. State*, 144 S.W.3d 487 (Tex. Crim. App. 2004), complaining about the lack of sponsoring witness and lack of proper authentication.

During the punishment phase, appellant's character was at issue by virtue of the mitigation special issue. The fact that appellant had such a photograph of himself and the unidentified woman is as least mildly probative of his attitude toward sex. State's Exhibit 86 did not confuse the issues by distracting the jury from the main issues of the case. The jury was not misled in its deliberation of the special issues by any undue weight placed on the photograph. Admission of the photograph did not cause undue delay or needlessly present cumulative evidence. While the photograph may have been prejudicial to appellant, it was not unfairly so simply because it cast him in a poor light.[58] We cannot conclude that the probative value of the photograph was substantially outweighed by its prejudicial effect. The trial court did not abuse its discretion in admitting the photograph during the punishment phase.

However, even if the trial court had erred in admitting the photograph, any such error was harmless because the potential prejudicial effect of this evidence pales in comparison to the rape-murder of which appellant was convicted, and the jury heard a substantial amount of evidence of prior violent conduct, including prior sexual assaults. It is unlikely that a single photograph depicting what may be consensual sexual activity would have exerted any significant influence upon the jury in this case. Point of error thirty is overruled.

### 3. *Exclusion of Expert Testimony*

In point of error twenty-nine, appellant alleges that the trial court erred in holding that Dr. John Sorenson was not qualified to testify as an expert on the topic of future dangerousness. Appellant argues that the predicate presented for Sorenson's testimony adequately met the

---

[58] *See Montgomery v. State*, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g).

requirements of Rule 705 of the Texas Rules of Evidence and that the proffered testimony was relevant to special issues two and three.[59]

Under Rule 702, the proponent of expert testimony must show by clear and convincing evidence that the testimony he seeks to introduce is sufficiently relevant and reliable to assist the trier of fact in accurately understanding other evidence or determining a fact issue.[60] In the soft sciences context, such as the prediction of future dangerousness at issue here, we ask three questions: "(1) whether the field of expertise is a legitimate one, (2) whether the subject matter of the expert's testimony is within the scope of that field, and (3) whether the expert's testimony properly relies upon and/or utilizes the principles involved in the field."[61] Sorenson possesses a B.A. from Pan American University, an M.A. in criminology and corrections from Sam Houston State University, and a Ph.D. in criminal justice, also from Sam Houston State University. Sorenson testified on voir dire that he anticipated "making an individualized assessment of the risk [appellant] presents while incarcerated." Sorenson stated that he would tell the jury that appellant presented only a 23.8 percent likelihood of committing "a serious violent act" while in prison, which Sorenson described as "average."

Sorenson based his opinion on "[d]ata collected from the Texas Department of Corrections on 6,390 murderers and their behavior while incarcerated during the 1990s." According to

---

[59] While appellant claims that the proffered testimony was relevant to special issues two and three, the charge of the court at punishment lists only two special issues, the future dangerousness special issue and the mitigation special issue. Further, Appellant states that Sorenson's testimony met Rule 705 requirements, but his argument relates to the trial court's "gate-keeper function," which is actually contained in Rule 702.

[60] *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992).

[61] *Nenno*, 970 S.W.2d at 561.

Sorenson's estimate, approximately 1,500 of the studied individuals were capital murderers, but none had been sentenced to death. Of that number, Sorenson estimated that only "a handful" or "between 20 and 30" were cases in which the State sought the death penalty. Sorenson restricted his definition of the serious crime committed by the studied individuals to only "Level 1 rule violations."

Sorenson also reviewed appellant's arrest records from Collin County, appellant's jail records, and the Texas Rangers' work-up of this case. Sorenson explained that he arrived at the 23.8 percent figure by starting with a base rate of 16.4 percent, which was the average base rate for the 6,390 studied murderers, and then factoring in 7.4 percent for appellant's extraneous offenses. According to Sorenson, appellant did not have any other aggravating factors that would have raised appellant's rate. Sorenson admitted he was aware that appellant had assaulted another inmate and created weapons while he was housed in the county jail. However, those incidents did not factor into Sorenson's prediction in any way.

Upon questioning by the trial court regarding whether anyone had "looked at and critically evaluated [his] methodology, pro or con or neutral" and published anything regarding that evaluation, Sorenson responded that nothing had been published evaluating his methodology. The trial court asked Sorenson to identify his potential rate of error. Sorenson answered that if the prediction is "23.8 percent, then it would prove over the course of the next forty years of incarceration that if I said a person's not going to be violent, I would have been wrong 23.8 percent of the time."

The trial court then asked defense counsel to explain why Sorenson should be allowed to testify. Counsel told the trial court that Sorenson "met the *Daubert* test." When asked specifically

about the issue of reliability, counsel responded that "I believe that's all been presented to the Court, and it's on the record."

The trial court found that Sorenson's anticipated testimony was not reliable and that it risked confusing and misleading the jury. The trial court stated:

> An expert opinion is admissible only if it would be helpful to a jury. It can't be helpful to a jury if it's not reliable. His last series of answers to me telling me he's got an excess of 23 percent rate of error is simply just by his own -- that's not reliable.
>
> The methodology is flawed not only, as the State points out, by the exclusion of capital murderers who have been sentenced to death, but the inclusion of people who have been convicted of murder, a method that does not look -- or that excludes a veritable cornucopia of acts of violence that the Court of Criminal Appeals has held to be -- to constitute criminal acts of violence is a flawed methodology.
>
> To limit it to the simple analysis of Type I violations in the prison system -- which, by his own paper, essentially is homicides, aggravated assaults, and sexual assaults -- is to eliminate a broad spectrum of criminal activity that a jury is allowed to consider, that the Court of Criminal Appeals has said things that constitute criminal acts of violence.
>
> It is silly. It is poor scholarship to come into a criminal courtroom to predict future acts of violence and not to include all of the things or even a majority of the things that a jury could consider.
>
> It doesn't help the jury.
>
> Even if somehow some court were to find that *Daubert* and its progeny under the applicable Texas case law were satisfied, it fails under a 403 analysis because of the risk of prejudice. The risk of confusion to the jury is too great. The risk of misleading the jury is too great to be outweighed by its probative value with an error rate of more than one in five. That's not helpful. It's -- it flat out fails under a 403 analysis.

The trial court concluded that it would not qualify Sorenson as expert, that the testimony he anticipated providing was not admissible because it did not satisfy the requirements of Rule 702, and that the testimony also failed under a Rule 403 analysis.

In reaching his conclusion that appellant, who had been convicted of capital murder, would present only a 23.8 percent chance of committing violent acts in the future, Sorenson relied on a study that only marginally included capital murderers against whom the State had sought the death penalty. Sorenson also restricted his definition of serious crime, relying only on what the Texas Department of Criminal Justice classifies as a Level I violation, which excludes many offenses that constitute acts of violence. When specifically evaluating appellant, Sorenson did not take into consideration appellant's actions of assaulting another inmate or creating weapons while housed in the county jail. Further, Sorenson's methodology has not been critically evaluated in any published material.[62] We cannot disagree with the trial court's determination that the evidence appellant sought to introduce through Sorenson's testimony was not sufficiently reliable to assist the jury in its decision of whether appellant posed a continuing threat to society. The trial court did not abuse its discretion in excluding Sorenson's proposed testimony. Point of error twenty-nine is overruled.

### 4. *Exclusion of Photographs*

In points of error thirty-one through thirty-six, appellant complains that the trial court improperly excluded mitigation evidence in the form of photographs during the punishment phase.[63] Appellant argues that the trial court should have admitted the photographs because they are relevant

---

[62] Given the nature of Sorenson's future dangerousness assessment, we disagree with the trial court's conclusion that the rate of error is twenty-three percent. We agree with the trial court's consideration of the absence of peer review, however. Sorenson did claim to have a methodology, and so peer review of that methodology was a legitimate a factor to consider in deciding whether to admit the evidence here. *Contrast Nenno*, 970 S.W.2d at 562 (expert witness did not claim to have a particular methodology for determining future dangerousness, but relied upon his experience in studying cases involving sex offenders).

[63] Though appellant discusses six photographs, he acknowledges that only two of those were excluded. He does not separately list the six points of error, and he gives no explanation for why there are six points instead of just two.

under *Tennard v. Dretke*.[64]  In *Tennard*, the United States Supreme Court rejected the Fifth Circuit Court of Appeals's constitutional relevance test and reaffirmed that the standard for relevance is "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[65]  Evidence that the jury could reasonably find warranted a sentence less than death cannot be barred.[66]

The two photographs excluded by the trial court were a photo of appellant at less than one year of age standing outside in a diaper (Defense Exhibit 1) and a photo of appellant posing on a hill with his mother, sister, brother, sister-in-law, and cousin (Defense Exhibit 6).  Appellant reasons that these photographs, as mitigating evidence, were admissible because the photographs "humanize[d] him before the jury as something other than a monster" and could be used by the jury "to believe that [appellant's] conduct could be modified in the environment of continuous prison custody for the rest of his life."

Contrary to appellant's argument, the photographs are not automatically considered relevant under *Tennard*.  While a photograph of appellant in a diaper and a photograph of him posing happily with his family do show that appellant was once a small child and part of a seemingly happy family at one time, neither photograph is automatically relevant to the mitigation special issue.  Neither of these photographs has any tendency to show that appellant is not a future danger, nor do these photographs affect whether sufficient mitigating circumstances exist to warrant a life sentence rather

---

[64]  542 U.S. 274 (2004).

[65]  *Id*. at 284-85.

[66]  *Id*.

than the death penalty.[67]  Appellant is essentially advocating a defendant analogue to the "quick glimpse of the life" afforded by victim character evidence.[68]  But concepts relating to impact and character evidence with respect to victims cannot necessarily be inverted for the benefit of the defendant.[69]

Even if they could, appellant concedes that the trial court admitted four of his photographs, which showed (1) appellant graduating from junior high school, (2) appellant at a track meet, (3) appellant as part of his school basketball team, and (4) appellant as part of his youth group at St. Williams Church.  Under the applicable standards relating to victim impact and character evidence, the trial court retains discretion under Rule 403 to limit the amount and scope of the evidence designed to show the quick glimpse the defendant was seeking.[70]  We cannot say that the trial court abused its discretion in withholding the admission of Defense Exhibits 1 and 6.

Moreover, even if the trial court had erred in excluding the photographs, any such error was harmless.  As we have just explained, appellant was able to introduce four of his "glimpse in the life" photographs to the jury.  Considering the admitted photographs, and also the enormity of appellant's crime and his prior bad acts, we can confidently say beyond a reasonable doubt that the exclusion of these two photographs did not contribute to the jury's assessment of punishment.  Points of error thirty-one through thirty-six are overruled.

---

[67]  *See* art. 37.071(e)(1)(mitigation special issue).

[68]  *Williams v. State*, 2008 Tex. Crim. App. LEXIS 692, *37 (June 11).

[69]  *See id.* at *75 (trial court may exclude "execution-impact" testimony); *Goff v. State*, 931 S.W.2d 537, 554-56 (Tex. Crim. App. 1996)(trial court not required to admit "reciprocal victim impact" evidence showing the allegedly bad character of the victim).

[70]  *See Williams*, 2008 Tex. Crim. App. LEXIS at *32.

### 5. *Identifications*

In point of error thirty-seven, appellant complains of testimony regarding photo lineups conducted during the investigations of two aggravated robbery extraneous offenses. Though the point of error speaks of the trial court erring in permitting the admission of the photo lineup, the argument section of appellant's brief indicates that he is complaining about the in-court identifications made by the victims of the two offenses. He claims that the in-court identifications were tainted by impermissibly suggestive photographic arrays and should have been excluded.

*First Identification*

The trial court held a hearing outside the presence of the jury on appellant's motion to suppress the identification of appellant by Nhat Thine Vu, the complainant in an extraneous aggravated robbery. Dallas Police Department Officer Paul Demaag testified that he prepared and showed a photo lineup to Vu. Vu stated that he was eighty percent sure that appellant was one of the people who robbed him. Demaag testified that, after Vu made the tentative identification, he did not indicate to Vu in any manner that Vu had "picked the right guy." Demaag also testified that he did not prepare any other photo lineups with appellant's picture in them in order to obtain a stronger identification.

The trial court denied the motion to suppress and Vu subsequently made an in-court identification of appellant. Vu testified during punishment and identified appellant as one of the three men who held him and Lian Trinh at gunpoint, demanded the couples' belongings, and then drove away taking Trinh with them. During Vu's testimony, no mention was made of any identification other than the identification of appellant that Vu made in court and no testimony regarding the photographic array in which Vu originally identified appellant was presented to the

jury. The record does not indicate that Vu's in-court identification was based on anything other than his in-court recognition of appellant as the person who committed the offense.

Appellant's brief on appeal does not point to any allegedly suggestive aspect of the photographic array presented to Vu. Though it is true that an in-court identification can be tainted by an impermissibly suggestive lineup,[71] the first step in such a process would be to show that the lineup was in fact impermissibly suggestive.[72] With respect to the photographic lineup presented to Vu, appellant has not even attempted to do so. He simply claims that the prosecutor did not interrogate Vu with respect to the "efficacy" of his identification, that Vu made only a tentative identification at the time of the photographic lineup, and that "there is nothing in the record to indicate that his identification was untainted by the photographic spread." But it is appellant's burden to explain what he thinks is suggestive about the array, and a failure to do so is fatal to his claim.[73] Absent a showing that the photographic lineup was impermissibly suggestive, the mere concern that a witness's identification may be inaccurate does not implicate due process.[74]

*Second Identification*

The trial court held a hearing outside the presence of the jury on appellant's motion to suppress the identification of appellant by Melissa Chavez, the complainant in another extraneous aggravated robbery. Dallas Police Department Officer Tim Stewart testified that he compiled a photo array of six individuals using appellant's photograph and those of suspects in other cases. He

---

[71] *See Neil v. Biggers*, 409 U.S. 188 (1972).

[72] *Conner v. State*, 67 S.W.3d 192, 200 (Tex. Crim. App. 2001).

[73] *Williams v. State*, 937 S.W.2d 479, 488 (Tex. Crim. App. 1996).

[74] *Ford v. State*, 919 S.W.2d 107, 117 (Tex. Crim. App. 1996).

showed the array to Chavez, instructing her that "the suspect may or may not be in the line-up, that she was to just look at them, and if she recognized anyone, point them out." Stewart testified that he did not tell Chavez that she had to pick anyone out and that he did not indicate in any way who she should pick. Stewart testified that Chavez chose the photo of appellant almost immediately upon seeing the photo array. Stewart described Chavez's identification as "positive."

The trial court denied the motion to suppress and Chavez subsequently made an in-court identification of appellant. Chavez testified during punishment that appellant approached her as she was sitting in her car in a parking lot at Richland College. Appellant first asked Chavez if he could see her phone. He then pointed a gun at her and demanded her keys. Appellant passed the keys to another person and ordered Chavez into the trunk of her car. When Chavez refused twice, appellant told her to start walking toward the street. When Chavez began walking, appellant drove away in her car. Chavez testified that she picked appellant out of the photo array and identified him in court because she would "never forget his face."

In his brief, appellant points out that Stewart admitted that appellant's photograph in the array that was presented to Chavez had a closer focus on his face than the other suspects. The photographic array, State's Exhibit 122, contains headshots of appellant and five other men. Although appellant appears to be in slightly closer focus than the others, the other individuals in the array are not greatly dissimilar in appearance from appellant. All have short hair and are Hispanic with similar facial features. They each fit a rough description of appellant. The closer camera angle on appellant is a minor difference that does not affect the reliability of the array.[75] We find that the

---

[75] See *United States v. Bautista*, 23 F.3d 726, 731 (2d Cir. 1994)(slightly brighter and more close-up photograph did not render photographic array more suggestive; the differences "would
(continued...)

photo array presented to Chavez was not impermissibly suggestive. Point of error thirty-seven is overruled.

### 6. *Statements to Police Regarding Extraneous Offenses*

In point of error thirty-eight, appellant complains that the trial court abused its discretion in allowing Dallas Police Department Officer Tim Stewart to testify about the statements appellant made regarding two extraneous aggravated robbery offenses. Appellant alleges that his statements to Stewart were involuntarily made.

During a hearing outside the presence of the jury, appellant testified that, at the time of his arrest for aggravated robbery, he was mistreated by the arresting officer. Appellant told the trial court that he had suffered a deep cut to his arm and that the arresting officer kept "slapping" the open wound until appellant would provide his name. He also complained that the arresting officer squeezed appellant's arm tightly when handcuffing him. Appellant further stated that he harbored a fear of the police as a result of his and his family's past dealings with police. Appellant explained that he had learned that his father had been beaten recently by the police.

However, appellant also testified that an officer other than the arresting officer transported him to the police department approximately forty-five minutes after his arrest. Appellant admitted that this second officer never threatened him and did not mistreat him. Appellant waited in a holding cell for less than fifteen minutes before being moved into an interview room. Appellant was allowed

---

[75](...continued)
hardly suggest to an identifying witness that [the defendant] was more likely to be the culprit"); *State v. Anthony*, 857 S.W.2d 861, 867 (Mo. App., W.D. 1993)(photograph taken at a slightly closer distance than the others was a "minor" difference that did not render photographic array impermissibly suggestive); *see also People v. Johnson*, 3 Cal. 4th 1184, 1217, 842 P.2d 1, 17 (1992) (differences in background color and image size did not render photographic array impermissibly suggestive).

to use the restroom before speaking with Stewart. Appellant admitted that Stewart, who was the only person in the room with him during the interview, never threatened him. Appellant never requested medical care. Appellant testified that Stewart promised to allow appellant to phone his mother and that Stewart would tell the district attorney that appellant had been cooperative.

Stewart, however, testified that he did not make any promises to appellant. Stewart testified that he advised appellant of his rights and that appellant understood and voluntarily waived those rights. According to Stewart, appellant was neither reluctant nor fearful during the interview. Additionally, Stewart did not recall appellant complaining to him that the arresting officer had mistreated appellant in any way.

The trial court found that appellant freely and voluntarily waived his rights and willingly provided the statements to Stewart free of threats. The trial court found no credible evidence that force was used against appellant or that there were any affirmative promises made to appellant to obtain the statements. Because the trial court's findings are supported by the record, they will not be disturbed on appeal. Point of error thirty-eight is overruled.

### 7. *Improper Cross-examination*

In point of error forty, appellant alleges that the trial court erred in overruling the defense objection to the State's cross-examination of defense expert Dr. Mark Vigen during punishment. Appellant specifically explains that the State's manner of cross-examination brought irrelevant facts of capital murder cases not associated with appellant before the jury in a way not sanctioned by the Texas Rules of Evidence.

During the cross-examination of Dr. Vigen, the State began questioning him regarding another capital murder trial in which he had testified as a mitigation expert for the defense. Defense

counsel objected to the relevancy of the other case. The State responded, "It goes to credibility. It goes to the jury's opportunity to judge his credibility and bias in these types of matters and [the jury] is entitled to hear what other types of cases in which he has testified to judge his credibility." The trial court overruled the objection. Dr. Vigen testified that he provided testimony in "around fifty or so" capital murder cases on behalf of the defense. He further testified that where he has been called as a mitigation expert, it has "always" been by the defense. The State questioned Dr. Vigen regarding six notable capital murder cases, identifying each by the defendant's name and by a brief synopsis of the facts of the case. In each, Dr. Vigen had testified for the defense as a mitigation expert or in the area of future dangerousness.

Rule 611(b) of the Texas Rules of Evidence provides that a witness may be cross-examined on any matter relevant to any issue in the case, including credibility. The trial court has discretion regarding the extent of cross examination of a witness for the showing of bias or as to credibility.[76] Its decision is not subject to reversal absent a clear abuse of discretion.[77]

The questions posed by the State were relevant to Dr. Vigen's credibility, and more specifically, his possible bias. We cannot say that the trial court abused its discretion in allowing the State to cross-examine Dr. Vigen regarding other cases in which he testified. Point of error forty is overruled.

**B. Jury Charge**

**1.** *Instructions Regarding Victim Impact Evidence*

---

[76] *See Cantu v. State*, 939 S.W.2d 627, 635 (Tex. Crim. App. 1996).

[77] *Id*.

In point of error fifty-two, appellant alleges that the trial court erred in failing to limit the jury's consideration of victim impact evidence "such that it is not to be considered in connection with the future dangerousness special issue, and to make a proper application of such law to the facts." The argument section of appellant's point of error is a single sentence, which fails to cite any authority, apply law to the facts, or make any explanation for why he thinks he is entitled to the instruction. The point of error is inadequately briefed. Moreover, the evidence shows that appellant knew his victim. When the defendant knows his victim, victim-related evidence is "necessarily relevant" to the defendant's future dangerousness, as well as his moral culpability.[78] Point of error fifty-two is overruled.

In point of error fifty-four, appellant complains, citing to *Mosley v. State*,[79] that the trial court failed to instruct the jury that victim impact evidence was not to be used to make any comparative worth analysis. Even if we were to assume, for purposes of argument, that appellant was entitled to such an instruction, he does not claim that he requested the instruction at trial, and without a request, he would be entitled to relief only if the record showed that he suffered egregious harm.[80] Appellant has failed to argue that he suffered any harm, much less egregious harm, and we perceive no egregious harm in this case. Point fifty-four is overruled.

### 2. *Agreement on Mitigating Circumstances*

---

[78] *Williams*, 2008 Tex. Crim. App. LEXIS at *34; *Roberts v. State*, 220 S.W.3d 521, 532 (Tex. Crim. App.), *cert. denied*, 128 S. Ct. 282 (2007).

[79] 983 S.W.2d 249 (Tex. Crim. App. 1998).

[80] *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

In points of error fifty-five through fifty-eight, appellant alleges that the trial court erred in failing to instruct the jury that it did not have to unanimously agree on which mitigating circumstances were sufficient to warrant the imposition of a life sentence in order to give a "yes" answer to the mitigation special issue. Appellant cites no authority, but we observe that article 37.071 requires that the trial court instruct the jury, with respect to the mitigation special issue, that it "need not agree on what particular evidence supports an affirmative finding on the issue."[81] An instruction conforming to this statutory requirement was submitted in the jury charge. Points of error fifty-five through fifty-eight are overruled.

### 3. *Various Challenges to the Death Penalty Scheme*

In a number of points of error, appellant raises attacks on the Texas death penalty scheme that we have already rejected. In points of error forty-two and sixty-seven, appellant contends that the mitigation special issue is essentially a nullification issue barred by the Supreme Court holdings in *Smith v. Texas* and *Penry v. Johnson*. In points of error forty-three through forty-six, appellant assails the rationality of the special issue instructions as not providing any meaningful guidance to the jury and failing to give an adequate vehicle for granting mercy based upon mitigating circumstances. In point of error forty-seven, appellant complains that the jury was not instructed that it may consider "non-*Penry*" mitigating evidence to rebut, and raise reasonable doubt about, the State's claim of future dangerousness, deliberation, and reasonable expectation of death, as well as in consideration of Special Issue No. 2 on mitigating circumstances. In points of error forty-eight through fifty-one, and seventy-two, appellant alleges that the jury should have been instructed on the meanings of particular words and phrases associated with jury charges in death penalty cases and

---

[81] Art. 37.071, §2(f)(3).

claims that the failure to do so violates the constitution. In point of error fifty-three, appellant alleges that the trial court erred in not instructing the jury that the presentation of victim impact evidence does not relieve the State of its burden to prove the future dangerousness special issue beyond a reasonable doubt. In points of error fifty-nine through sixty-two, appellant contends that the trial court erred in failing to inform the jury that a failure to unanimously agree on the answers to the special issues would result in a life sentence rather than a mistrial. In point of error sixty-three, appellant alleges that the trial court erred in instructing the jury on the special issues because those issues were not alleged in the indictment. In points of error sixty-four and seventy, he contends that due process requires that the burden be placed on the State to prove lack of mitigating circumstances beyond a reasonable doubt. In point of error sixty-five, appellant contends that the trial court erred in "failing to require proof of extraneous offenses and other misconduct beyond a reasonable doubt."[82] In points of error sixty-six, seventy-three, seventy four, and seventy-seven, appellant contends that the capital punishment scheme, or the mitigation issue in particular, creates an unconstitutionally open-ended and arbitrary process for imposing the death penalty in violation of the federal and state constitutions. In points of error sixty-eight, sixty-nine, and seventy-six, appellant contends that the defendant implicitly bears the burden of proof on the mitigation special issue, or at least on aggravating circumstances relevant to that issue, in violation of federal and state constitutional requirements. In point of error seventy-one, appellant contends that the statutory requirement of at least ten "no" votes for the jury to return a negative answer to the future dangerousness special issue violates the prohibition against cruel and unusual punishments. In point

---

[82] Contrary to appellant's claim, the trial court *did* submit an explicit "beyond a reasonable doubt" instruction with respect to extraneous offenses.

of error seventy-five, appellant alleges that the trial court erred in overruling appellant's motion to hold article 37.071 unconstitutional because the "statute fails to require the issue of mitigation be considered by the jury." In point of error seventy-eight, appellant contends that capital sentencing scheme violates applicable constitutional requirements because it does not permit meaningful appellate review.

All of these challenges have been rejected.[83] We have held that it is sufficient to dispose of these types of challenges "by recognizing that the trial court submitted a charge consistent with applicable state statutes, which have withstood numerous constitutional challenges."[84] Such is the case here. Points of error forty-two through fifty-one, fifty-three, and fifty-nine through seventy-eight are overruled.

In point of error seventy-nine, appellant alleges that the trial court erred in overruling appellant's second motion to set aside the indictment as being unconstitutional. Appellant states that he "filed a Motion to Quash the indictment raising numerous constitutional issues concerning the death penalty." Appellant lists the ten constitutional issues that were raised in the Motion to Quash but provides no argument and does not apply these issues to the facts of this case. Point of error seventy-nine is inadequately briefed and is overruled.

## V. CUMULATIVE ERROR

In points of error eighty and eighty-one, appellant urges this Court to consider the cumulative impact of the errors presented above. While a number of errors may be found harmful in their

---

[83] *Saldano v. State*, 232 S.W.3d 77, 104-09 (Tex. Crim. App. 2007), *cert. denied*, 128 S. Ct. 1446 (2008); *Blue v. State*, 125 S.W.3d 491, 504-05 (Tex. Crim. App. 2003).

[84] *Saldano*, 232 S.W.3d at 107.

cumulative effect,[85] cumulative error has not been shown here.[86]   Points of error eighty and eighty-

one are overruled.

We affirm the judgment of the trial court.

Delivered: November 5, 2008
Do Not Publish

---

[85]  *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

[86]  *Wright v. State*, 28 S.W.3d 526, 537 (Tex. Crim. App. 2000).